ORIGINAL

FILED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST AND CLAIM

JAN 3 0 2012

U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| TIGERSWAN, INC.<br>3452 Apex Peakway<br>Apex, NC 27502 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) Case No. 12 - 62 C<br>) |
| v. | )<br>) |
| THE UNITED STATES. | )<br>) |
| Defendant. | )<br>)<br>) |

## COMPLAINT

Plaintiff TigerSwan, Inc. ("TSI"), by and through its undersigned counsel, submits the following Complaint.

## NATURE OF THE ACTION

This Complaint asserts a claim under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et seq.*, for damages incurred as a result of the Government's breach of its implied duty of good faith and fair dealing by: (1) improperly terminating for convenience two contracts that had been properly awarded to TSI and subsequently cancelling the solicitation under which TSI had won those two contracts; and (2) subsequently awarding a sole-source contract for performance of the terminated work to a competitor based on a sole-source justification and approval that violated Federal laws and regulations. The Government's breach damaged TSI by depriving TSI of the profits it anticipated making on the second terminated contract.

This Complaint also asserts a bid protest under 28 U.S.C. § 1491(b), seeking bid and proposal costs incurred by TSI in preparing the successful offers for the two terminated contracts, based upon: (1) the Government's prejudicial violation of Federal statutes and

1

regulations in its cancellation of the solicitation under which TSI was a two-time contract awardee in favor of subsequently awarding a sole-source contract for performance of the terminated work to a competitor; and (2) the lack of a rational basis for the Government's cancellation of the solicitation and its arbitrary and capricious award of a sole-source contract for performance of the terminated work to a competitor to the prejudice of TSI.

## PARTIES

1.      Plaintiff TSI is a Colorado corporation with its principal place of business at 3452 Apex Peakway, Apex, NC 27502.

2.      Defendant is the United States of America, acting by and through the Department of Defense ("DoD"), specifically the Department of the Army (the "Agency"), Iraq APO, AE 09342.  The Agency's office in Iraq was CENTCOM – Joint Theater Support Contracting Command, also referred to as CENTCOM Contracting Command or C3.

## JURISDICTION AND STANDING

3.      This Court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a) over TSI's CDA-based claims that the Agency: (1) improperly terminated TSI's contracts for convenience; (2) subsequently awarded a sole-source contract for performance of the terminated work to the incumbent based on a sole-source justification and approval that violated Federal laws and regulations; and (3) rejected TSI claims for anticipatory profits and bid and proposal costs under both contracts.

4.      TSI satisfies the standing requirements to assert claims for money damages under CDA, because TSI alleges an injury in fact that is fairly traceable to the Agency's actions and can be redressed by a favorable decision.

2

5. TSI's CDA claim is timely because it is being filed within twelve months of TSI's receipt of the Contracting Officer's February 2, 2011 and July 12, 2011 Final Decision denying TSI's claims.

6. This Court has jurisdiction over TSI's bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491. TSI brings this action for: (1) the Agency's prejudicial violation of Federal statutes and regulations in connection with its sole-source contract award to Aegis Defence Services, Ltd. ("Aegis"); and (2) the lack of a rational basis for the Agency's cancellation of the solicitation and its arbitrary and capricious award of a contract for performance of the terminated work to a competitor, Aegis based on a faulty sole-source justification and approval to the prejudice of TSI.

7. TSI is an interested party with standing to bring this protest because it: (1) would have been a qualified bidder but for the Agency's improper actions; (2) possessed the requisite direct economic interest; and (3) was prejudiced by the Agency's action because there was a substantial chance it would have received the contract award but for the Agency's errors in the procurement process.

8. Specifically, the Agency failed to post a pre-solicitation notice for the Aegis solicitation in accordance with 10 U.S.C. § 2304(g), so TSI was not placed on notice of the Aegis solicitation. Further, TSI affirmatively expressed its interest to the Agency in the underlying work for the sole-source contract award to Aegis, expressed its capability to perform the underlying work to the Agency, and properly challenged the sole-source award once it was placed on notice of the Agency's actions. TSI expressed its capability to perform the work to the Agency in its previous proposals, which included extensive documentation demonstrating that it was capable of performing the underlying work, and the Agency recognized this capability by

3

twice awarding the contract to TSI. Thus, TSI would have been a qualified bidder if the bid process was made competitive, and TSI would have had a substantial chance of being awarded the underlying work but for the Agency's improper sole-source award to Aegis.

**FACTUAL BACKGROUND**

9.     This lawsuit involves, *inter alia*, two contracts: (1) Contract No. W91GDW-10-C-6001 (the "6001 Contract"), attached hereto as Exhibit 1; and (2) Contract No. W91GDW-10-C-6005 (the "6005 Contract"), attached hereto as Exhibit 2.

10.     Aegis was the incumbent for the underlying services and work procured by the 6001 and 6005 Contracts.

**A.     6001 Contract for Security and Protection Services in Iraq.**

11.     On June 22, 2006, the DoD created the Task Force for Business and Stability Operations ("TFBSO") under the purview of the Deputy Under Secretary of Defense for Business Transformation. Exh. 1, 6001 Contract, pp. 30-31.

12.     The TFBSO is described as:

> a command resource in direct support of the economic line of operation within the Combatant Commander's Campaign Plan, with 400 highly qualified business specialists and government personnel supporting military and civil affairs units, provincial reconstruction teams, Iraqi Security Forces, and senior Government of Iraq officials.

Exh. 1, p. 31.

13.     A full and open competition for a non-commercial item contract was conducted by the Agency for the 6001 Contract, from January 31, 2010 to February 27, 2010. On March 1, 2010, TSI was awarded the 6001 Contract on a best value basis, in the amount of $3,949,791.35, for a 183-day (approximately six month) performance period, with the base period from June 25, 2010 to December 24, 2010, and an option period running from December 25, 2010 to June 24,

2011. See Fed Biz Opps Notice of Award, attached hereto as Exhibit 3; see also Exh. 1, p. 40, no. 13 (period of performance).

14.     The objective of the 6001 Contract was to:

provide all resources, including experienced multi-disciplined security personnel, equipment, weapons, armored vehicles, mobilization multiple self-sustaining life support camps[1] (Basra, Baghdad, and two optional additional locations), surge capability, security and intelligence analysis, incidental deliverable, and project management necessary to ensure the security and safety of TFBSO personnel and sponsored visitors operating throughout all regions of Iraq.

Exh. 1, p. 31.

15.     The classification code used for the 6001 Contract's award notice was "R -- Professional, administrative, and management support services." Exh. 3, Bates No. 123.[2]

16.     TSI's 6001 Contract award was protested by Aegis before the U.S. Government Accountability Office (the "GAO"), and by another bidder, AISG/Patriot Group Partnership, in the Court of Federal Claims ("CFC"), case no. 10-158.  However, the Agency terminated the 6001 Contract for convenience (the "6001 T for C") before either the GAO or the CFC addressed the merits of the protests.

17.     On April 23, 2010, the Agency terminated the 6001 Contract for convenience on the alleged basis that there were "significant changes in operational and force protection conditions in Iraq, as well as changes in mission requirements," with the Agency stating that "this contract no longer meets the needs of the Task Force for Business and Stability Operations

---

[1] The 6001 Contract defines "camp" as a "self-sustaining base of operations where TFBSO Staff and guests can work and live out of[; t]o include housing with individual bathroom facilities, office space, dining facility, laundry facility, and the ability to provide twenty four hour security." Exh. 1, p. 31.

[2] Specific Bates Numbering references in this Complaint refer to the nonsealed exhibits and are hereinafter referred to as "p. _____").

(TFBSO)." Exhibit 4, April 23, 2010 Notification of Termination for the Government's Convenience, Contract W91GDW-10-C-6001, ¶ 1.

18.    In the 6001 T for C, the Agency also stated the following as changes in contractual requirements:

> Post election violence directed at high-value targets is of significant concern.  Changes in the requirement include:
>
> -Elimination of the 40% Iraqi personnel requirement
> -Elimination of the 100% indigenous Iraqi team requirement
> -Elimination of the Anbar and KRG optional base camps
> -Elimination of the additional team required for missions in culturally-sensitive sites and in unsecure areas of the International Zone.

Id., ¶ 2.

19.    In addition, the 6001 T for C stated that:

> Of the awarded contract, the only remaining requirement is the routine airport mission to Sather AB and Baghdad International Airport, which is limited to four (4) runs per week and does not require the originally envisioned 19-person team per mission.  The TFBSO no longer has a requirement for missions to culturally-sensitive sites since the TFBSO is no longer facilitating new investor visits.  Finally, since there is no longer a definite date for the opening of the 14th July Bridge, the TFBSO no longer has a requirement to operate in unsecured areas of the International Zone.

Id., ¶ 3.

20.    Subsequently, on May 23, 2010, TSI submitted its damages to the Agency related to the 6001 T for C in the amount of $56,246.24.  See attached hereto as Exhibit 5, TSI's damages for the 6001 T for C.[3]

---

[3]  In its May 23, 2010 letter, TSI refers to a protest it submitted on May 3, 2010, to the Contracting Officer based on TSI's belief that the termination for convenience was improper. Exh. 5, p. 1. Upon information and belief, the Contracting Officer never issued a response to the May 3, 2010 protest. Please note that Exhibit 5 excludes the May 3, 2010 protest letter identified as Enclosure 1 (Plaintiff was unable to locate this letter in its records).

21. On September 24, 2010, a settlement related to the 6001 T for C was reached, totaling $56,246.24, and was reduced to writing as Modification No. P00005 to the 6001 Contract. See Modification P00005, attached hereto as Exhibit 6. The release of claims in Modification No. P00005 released the Government "from any and all liability under this contract for further equitable adjustments," but did not waive TSI's right to protest the Government's T for C of the 6001 Contract. Id.

22. TSI received payment in the amount of $56,246.24 for the 6001 T for C settlement.

**B.      6005 Contract for Security and Protection Services in Iraq.**

23. On June 7, 2010, the Agency issued a new TFBSO non-commercial item Solicitation No. W91GDW-10-R-6008 for what the Agency claims were its "changed needs." Due to time constraints, the Agency limited competition to the five vendors that submitted proposals for the previous 6001 Contract, including TSI and Aegis. The period of performance was 220 days (slightly over seven months).

24. Three vendors submitted offers. TSI's price was $5,678,082.44; Aegis proposed a price of $8,754,411 and a third offeror proposed a price of $15,940,217.35. See Exhibit 7, Matter of Aegis Defense Sys., Ltd., B-403226 et al., Oct. 1, 2010, 2010 CPD ¶ 238, p. 141.

25. Once again, TSI was the chosen awardee based on the Agency's decision that TSI provided the best value to the Government. On June 22, 2010, the Agency issued a Notice to Proceed ("NTP") to TSI for the 6005 Contract.

26. Despite the fact that the Agency issued a NTP for the 6005 Contract on June 22, 2010, three days prior, on June 19, 2010, Ms. Regina A. Dubey, SES, DoD, the Agency's

Program Director,[4] executed a Justification and Approval for Other than Full and Open Competition (the "Aegis Bridge Contract J&A I") to allow Aegis to continue performing under a thirty-day bridge contract, from June 25, 2010 to July 24, 2010.

27.     The Aegis Bridge Contract J&A states the following as authority cited for the bridge contract to Aegis: "…Only One Responsible Source and No Other Supplies or Services Will Satisfy Agency Requirements." Exhibit 8, Aegis Bridge Contract J&A I, ¶ 4.

28.     The Agency did not deem TSI non-responsible. To the contrary, the Agency issued a NTP to TSI for the 6005 Contract while it was drafting the Aegis Bridge Contract J&A. Moreover, as the awardee of both the 6001 Contract and the 6005 Contract, the Agency necessarily found TSI to be a responsible offeror.

29.     On or about June 23, 2010, and approximately four days after Ms. Dubey signed the Aegis Bridge Contract J&A I, Aegis filed a GAO protest regarding TSI's 6005 Contract award.[5]

30.     On July 5, 2010, the Agency issued a Stop Work Order to TSI for the 6005 Contract, which was issued due to Aegis's GAO protest.

31.     On August 3, 2010, the Agency issued a Sole Source Justification for Simplified Acquisition under the Test Program for Commercial Items, which allowed for a four (4) month bridge contract until Aegis's GAO protest was resolved. Exhibit 9, Aegis Bridge Contract J&A II.

---

[4] Ms. Dubey is also referenced later in the Complaint; see infra, pp. 8; 21; 24.

[5] Aegis's GAO protest was denied on October 1, 2010. Pursuant to GAO's 100 day deadline to determine protests, Aegis's GAO protest would have been filed no earlier than June 23, 2010, 100 days prior to the decision on October 1, 2010.

32.    On October 1, 2010, the GAO denied the second Aegis protest, stating the following for its digest summary:

> Agency reasonably determined that awardee's pricing was realistic, notwithstanding the fact that it was below that of the other technically acceptable offerors, where the agency determined that awardee's lower pricing was due to its particular staffing approach, which allowed it to significantly reduce its costs.

Exh. 7, p. 139.

33.    Despite the fact that Aegis's GAO protest of the 6005 Contract award was denied, Aegis nevertheless received a sole-source award of the underlying contractual work for which TSI received two contract awards under circumstances of full and open competition.[6]

34.    In line with Aegis's interests, instead of lifting the 6005 Stop Work Order following the GAO denial of Aegis' second protest, the Agency terminated TSI's 6005 Contract for Convenience (the "6005 T for C") on October 9, 2010.  The 6005 T for C notification is attached hereto as Exhibit 10.

35.    Neither the 6005 T for C notification nor any Agency communications to TSI surrounding the 6005 T for C stated any reasoning behind the 6005 T for C.

36.    On October 21, 2010, TSI submitted a settlement proposal and supporting documentation for $92,949.09 to the Agency related to the 6005 T for C, and reserved its right to bring a contractual claim regarding the 6005 T for C. See Exhibit 11, Oct. 30, 2010, Memorandum for Record, Modification W91GDW-10-C-6005-P00003, Settlement Invoice, TFBSO PSD.[7][8]

---

[6] See infra, Section C: The J&A Sole-Source Award to Aegis.

[7] PSD stands for "Personal Security Detail."

[8] Exhibit 11 includes the memorandum but excludes the memorandum's accompanying exhibits.

37.     On October 26, 2010, TSI submitted a revised settlement proposal for the 6005 T for C totaling $98,111.85, which added 10% G&A to the rates submitted on October 21, 2010. See Exh. 11, p.158, ¶ 1.

38.     On October 30, 2010, the Agency released a final settlement invoice and Modification No. P00003 for the 6005 Contract (the "6005 Settlement Modification"), concluding TSI's proposal of $98,111.85 was reasonable. See Exh. 11, p. 158-59; p. 476.

39.     Because TSI determined that it had additional significant outstanding costs that had not been incorporated into its October 26, 2010 proposal, TSI did not sign the 6005 Settlement Modification until January 14, 2011, at which time it specifically reserved its right to appeal its claim for anticipated profits on the 6005 Contract and its claim of G&A costs for the 6001 Contract.  TSI's reservation of this right to appeal was acknowledged by the Agency. Exhibit 12, Jan. 13, 2011 Email from Captain Nathaniel T. Franz to TSI.

## C.     The J&A and Sole-Source Award to Aegis.

40.     In late October 2010 through November 6, 2010,[9] the Agency prepared, reviewed, and approved a "Justification and Approval for Other than Full and Open Competition" (the "J&A") to justify the award of a sole-source, commercial item contract to Aegis, Contract No. W91GDW-11-C-9000 (hereafter referred to as the "Aegis Sole Source Contract"). The J&A is attached hereto as Exhibit 13.

---

[9] The J&A is undated, but the first signature date is October 25, 2010, and it was posted on Fed Biz Opps on November 6, 2010. See Exh. 13.

10

41.     The J&A cited as its authority FAR 13.501(a)(ii)[10] and 10 U.S.C. § 2304(g)(1)(B). FAR 13.501(a)(1)(ii) authorizes an agency to use a test program for certain commercial items as further described in FAR Part 12.

42.     FAR 12.207(e) prohibits, for commercial item purchases, the use of any contract type other than that authorized in FAR 12.207. Neither a cost reimbursement nor a cost-plus percentage of cost contract is authorized by FAR 12.207.

43.     Although the Agency designated the Aegis Sole Source Contract as a firm-fixed-price contract, it actually included line items that were cost-reimbursement items as well as one item that was a cost-plus-percentage of cost item. See Exhibit 14, Contract No. W91GDW-11-C-9000, p. 170 (line item 3: cost-plus-percentage of cost item), pp. 168-176 (allowable line items). Thus, although the Agency called the Aegis Sole Source Contract a firm-fixed-price contract, the Aegis Sole Source Contract price clearly was not fixed as evidenced by the cost-reimbursement line items and the cost plus percentage of cost line item. See id.

44.     10 U.S.C. § 2304(g)(1)(B), which was cited in the J&A, requires the performance of market research as a prerequisite to the use of the test program on which the Agency based the sole-source contract.

45.     Despite the market research requirement of 10 U.S.C. § 2304(g)(1)(B), the Agency concluded that market research was "N/A" in paragraph 8 of the J&A. Exh. 13.

46.     10 U.S.C. § 2304 also requires the Agency to comply with the simplified acquisition requirements in 41 U.S.C. § 427 which in turn requires Agency compliance with 41 U.S.C. § 416. The latter statute imposes a requirement that the Agency provide a 15-day advance notice of solicitation to be published on Fedbizopps.gov.

---

[10] Although the Agency cited FAR 13.501(a)(ii) for its J&A authority, that provision does not exist. Plaintiff assumes the Agency meant to reference FAR 13.501(a)(1)(ii).

47.     The Agency failed to provide a 15-day advance notice of the solicitation to be published in Fedbizopps.gov.

48.     One exception to the 15-day advance notice of solicitation is for "utility services…and only one source is available." 41 U.S.C. § 416(c)(1)(F).

49.     The Fedbizopps.gov notice of award claimed that this Aegis sole-source contract was "Classification Code: S - Utilities and housekeeping services." See Exhibit 15, Notice of Award, Aegis Contract.  The two Fedbizopps.gov Notices of Award dealing with the TSI contract awards referred to a different classification, one for which there was no statutory requirement for 15-day advance notice of solicitation: "Classification Code R – Professional, administrative, and management support services."  Although the work was the same under the Aegis Sole Source Contract as it was under TSI's 6001 and 6005 Contracts, the Agency changed the acquisition from non-commercial to commercial and changed the classification from Code R to Code S to avoid the 15-day advance notice requirement.

50.     The Agency stated certain reasons for awarding the 6005 Contract work to Aegis. First, it stated that Aegis was the only contractor that could meet the Agency's requirements:

> AEGIS, the current incumbent, is the only contractor able to meet the requirement by 25 November 2010 and be 100% ready to perform. The current sole source contract performance began on 25 July 2010 and expires on 24 November 2010.  It served as a bridge to continue services until a GAO protest was resolved for the previously competed contract for PSD service.  The previous contract was awarded to TigerSwan Inc. on 24 June 2010.  The contracting officer received notice of a protest on 2 July 2010 and issued a Stop Work Order to TigerSwan Inc. on 5 July 2010. Due to the protest, TigerSwan Inc. could not continue mobilizing nor continue services as originally planned.

Exh. 13, ¶ 5.

51.     Despite the Agency's J&A contention that only Aegis could perform the underlying TFBSO work and that no other contractor could perform the work, if the Agency had

lifted the 6005 Stop Work Order on October 1, 2010, the date that Aegis's second GAO protest was denied, TSI would have been fully able to execute the requirements of the 6005 Contract by November 3, 2010.[11]  Exhibit 16, Declaration of Brian Searcy, TSI President and Chief Operating Officer, p. 236, ¶ 3 (hereinafter referred to as "Searcy Decl.").

52.    The J&A also stated that the timeframe and costs associated with mobilizing a workforce made it necessary to make a sole-source award:

> **Qualified Workforce:** The limited timeframe may constrain the ability of a contractor to hire and retain a quality workforce throughout the entire performance period.  Uncertainty in the quality of personnel available to perform on a reduced requirement with increased security threats limit a competitively awarded contract to perform the necessary services.  The time available to recruit and train a qualified workforce would prove difficult at a competitively awarded price. The incumbent already has a qualified workforce in place and operating.
>
> **Mobilization Cost:** The cost the Government would incur in a transition from the incumbent to a new contractor would be too great to justify a fair and reasonable price.  The incumbent in place will require limited to no mobilization costs, whereas, mobilization of a new contractor will require significant costs.  Furthermore, the average time to fully mobilize a security type contract is currently estimated to be 45-60 calendar days which would exceed the required start date of 24 Nov 2010.  Current military operations have limited air and ground assets given OPERATION NEW DAWN mission priorities.  Assets for any contractor mobilization would unnecessarily burden or tax the transportation system.

Exh. 13, ¶¶ 7-8 (emphasis in original).

53.    The largest mobilization arrangement for the 6005 Contract was obtaining and shipping armored vehicles.  TSI had already shipped the armored vehicles for the 6005 Contract, which were on the ground in July 2010, well in advance of the 6005 T for C and the J&A, and the Agency had express knowledge that TSI had already completed this extensive mobilization arrangement prior to the 6005 T for C and the J&A.  Exh. 16, Searcy Decl., p. 236, ¶ 4.

---

[11] The 6005 Contract had a mobilization period of 32 days.

54.     TSI has been executing security, training and logistical contracts in Iraq since early 2008 and is intimately familiar with the security requirements regarding the Iraqi Theater of Operations ("ITO"). TSI has trained and mobilized over 600 security personnel in Iraq since February of 2008 in full compliance with Iraqi and United States security regulations. Many of the mobilizations were conducted in a time period of 30 days or less. Exh. 16, p. 236, ¶ 5.

55.     The J&A also stated that the TFBSO's mission would be negatively impacted by a new service provider because a new service provider would not be able to attract a quality workforce:

> **Change in Scope:** A new service provider for the limited two month period of performance would negatively impact TFBSO's mission. The mission would be impacted by a new service provider not being able to attract and retain a quality workforce for just two months, increasing the transition costs, and not having a contractor with the familiarity and experience required to operate within the ITO.[12] The security situation and threat condition on the ground has deteriorated drastically since the 24 June 2010 award. With seven months since the national elections, the absence of a national government and effective law enforcement has significantly degraded the security situation, combined with a significant and well advertised reduction in U.S. combat forces, will result in higher operational risk to the client over the last two months than was expected for the remaining performance period. The decreased amount of combat troops occupying the ITO and the increase[d] threat conditions amplifies the importance of personal relationships with local nationals that have the ability to influence the general populace is of extreme importance. The incumbent has formed those relationships where a new contractor would need to initiate and cultivate a personal relationship with local nationals. Thus, the change in the security condition necessitates the need for a PSD team already familiar with the increased threat conditions.

Exh. 13, ¶ 6 (emphasis in original).

56.     Lastly, the J&A discussed "Familiarity and Experience" as support for the sole-source award claiming that two months would not be sufficient time for a new contractor to create positive relationships and connections with the local leaders:

---

[12] ITO stands for "Iraqi Theater of Operations."

14

> **Familiarity and Experience:** There is limited time for a new contractor to coordinate with all stakeholders in the battle space to include the local population, tribal and religious leaders, business men, trade unions, etc., without a potential risk of reduced operational security. A comprehensive knowledge of the tribal relationships, their history, and an up to date understanding of the constantly changing security conditions and resulting relationships between key Iraqi personnel is critical. Those connections take time to develop. There is not sufficient time for a new contractor to create positive relationships and connections with the local leaders over a few months. A change in personnel would result in having to reestablish a rapport with all the PSD teams that promotes increased security. The current workforce has a rapport with all stakeholders, the local populace, tribal and religious leaders, business men, and trade unions. Finally, they are also familiar and highly experienced with the routes utilized for these services.

Id., ¶ 9 (emphasis in original).

57.    Due to TSI's ITO experience, TSI has established many long-term and exceptional relationships with Iraqi local nationals, as well as Iraqi political leaders. Exh. 16, Searcy Decl., p. 237, ¶ 6.

58.    Prior to 2008, TSI's owner James Reese served in a high-level United States Federal Government position in Iraq, from 2003 to 2005, and had established lasting relationships with local nationals, tribal leaders, religious leaders, businessmen, trade unions and Iraqi Governmental and political figures. Exh. 16, Searcy Decl., p. 237, ¶ 7.

59.    TSI has performed numerous security and support contracts for the United States Federal Government in Iraq, including: (i) a Global Linguistics Solutions ("GLS") linguist support contract for 220 Arabic linguists, from October 2008 to June 2011; (ii) a GLS contract for transition support services for 15 logistics personnel, from February 2008 to June 2008; (iii) security services for 247 security guards, from February 2008 to August 2010; (iv) a GLS security services contract for 120 security guards and for the provision of mobile security, from April 2010 to July 2011; and (v) a contract to provide 22 security personnel, as well as provide

security and logistics support throughout Iraq, from March 2010 to August 2011 for Harris Communications Corporation. Exh. 16, Searcy Decl., p. 237, ¶ 8.

60.     TSI has a long-standing teaming agreement with the Babylon Eagles, an Iraqi company. The Babylon Eagles provide, *inter alia*, local nationals, trained third country nationals, and expatriates on short notice and for short-term assignments. Exh. 16, Searcy Decl., p. 237, ¶ 9.

61.     TSI also had a large number of personnel in the ITO executing other contracts that were coming to an end in the October 2010 time frame; these personnel would have been readily available for performance of the 6005 Contract. Exh. 16, Searcy Decl., p. 237, ¶ 10.

62.     On November 16, 2010, the Agency awarded the Aegis Sole Source Contract, in the amount of $3,037,880.14, for a 60-day performance period, from November 25, 2010 to January 31, 2011. Exh. 14, Aegis Sole Source Contract.

63.     If the Agency had properly posted the pre-solicitation notice for the Aegis solicitation in accordance with 10 U.S.C. § 2304(g), the Agency would have learned that TSI was capable of doing the work for which the Agency believed Aegis was the sole-source, but the Agency failed to do so.

64.     TSI's costs to execute the 6005 Contract for seven (7) months (or 215 days) were $5,678,082.46, making its daily rate of operations $26,409.69. Exh. 16, Searcy Decl., p. 237, ¶ 11.

65.     The $5,678,082.46 figure includes TSI's mobilization costs. Exh. 16, Searcy Decl., p. 237, ¶ 12.

66.     Aegis's costs to execute its sole-source Contract for 67 days were $3,037,880.14, making its daily rate of operations $45,341.50.  See Exhibit 17, p. 12 of TSI's June 2, 2011 Claim; see Exhibit 24 (full 6.2.11 TSI claim).

67.     Thus, Aegis's performance costs were 58.2% higher than TSI's performance costs.  Exh. 17.

68.     Between June 24, 2010 and November 2010, the security situation in Iraq was not degrading; in fact, it was improving.  Exh. 16, Searcy Decl., p. 238, ¶ 13; see also Exhibit 18 (pertinent public information demonstrating that the Iraqi security situation was improving and not degrading).

69.     If the Agency had provided the 15-day advance notice of solicitation required by Federal Law prior to the Agency awarding the sole-source contract to Aegis on November 16, 2010, TSI would have submitted a bid prior to the close of the solicitation period, but was prevented from doing so on the basis of improper Agency action.  Exh. 16, Searcy Decl., p. 238, ¶ 13.

### D.     TSI's FOIA Request.

70.     On November 1, 2010, in an effort to discover the reasons for the Agency's termination of TSI's contracts, TSI filed a Freedom of Information Act request (the "FOIA Request").

71.     TSI requested the following Agency records:

> 1. All emails, letters, memoranda or other records memorializing any conferences, agreements, discussions or exchanges between the Principal Assistant Responsible for Contracting Iraq ("PARC") or the Contracting Officer for the subject contract [6005 Contract], and any private person or company concerning the reasons for the Government's T for C of the subject contract.

17

2. All email[s], letters, memoranda or other records memorializing any conferences, agreements, discussions or changes between the PARC or Contracting Officer for the subject contract and any employee of the Department of Defense or any Department of Defense contractor concerning the PARC or Contracting Officer's reasons for the T for C of the subject contract; and

3. All reports, surveys, memoranda, email[s] or other records memorializing the PARC's and/or Contracting Officer's reasons for the T for C of the subject contract.

72. A month later, on December 2, 2010, the Agency provided one redacted email to TSI in response to TSI's FOIA Request, which was the email notifying TSI of the Agency's decision to terminate the 6005 Contract for convenience (an email that TSI obviously already had).

73. On December 17, 2010, TSI appealed the Agency's response to its FOIA Request.

74. To date, the Agency has not substantively responded to TSI's FOIA Request.

**E.    TSI's Claims.**

**1.    November 2010 Claim**

75. On November 3, 2010, prior to the J&A publication in Fedbizopps.gov of the sole-source award and TSI's receipt of the J&A on January 3, 2011, TSI submitted its first breach of contract claim to the Contracting Officer, properly and timely asserting its certified claim in writing, as a matter of right, and for a sum certain. See Ex. 19, TSI's November 3, 2010 Claim (hereinafter referred to as the "November 2010 Claim"). TSI's November 2010 Claim was based on its belief that the terminations for convenience of both the 6001 and 6005 Contracts were an abuse of discretion and based on bad faith. As stated in the November 2010 Claim, TSI was ready to perform under both contracts. Instead, the Government's terminations for convenience improperly allowed the incumbent to continue performance through bridge contracts and eventually the improperly awarded sole-source contract.

18

76.     TSI's November 2010 Claim sought, *inter alia*, (i) labor and legal costs related to the Agency's bad faith 6005 T for C; (ii) an updated 6001 Contract invoice seeking additional labor costs (G&A costs); and (iii) an updated final invoice for the 6005 Contract, which the Agency approved in the 6005 Settlement Memorandum. See Exh. 19.

77.     On January 3, 2011, TSI received the December 22, 2010 Contracting Officer's decision on the November 2010 Claim. Attached to that decision was a copy of the J&A for the Aegis Sole Source Contract. This was the first time TSI learned of the J&A. Exhibit 20, Contracting Officer's December 22, 2010 Final Decision.

78.     In the decision received by TSI on January 3, 2011, the Contracting Officer: (i) agreed to pay certain costs toward the 6005 T for C claim; (ii) did not agree to pay additional 6001 Contract labor costs; (iii) did not agree to pay TSI's bad faith claim; and (iv) refused TSI's request to be reinstated as the TFBSO contract awardee. See Exh. 20.

## 2.     January 2011 Claim and Request for Reconsideration

79.     On January 20, 2011, TSI sent the Contracting Officer "a formal demand for the Government to reconsider its obligation to pay TSI's breach of contract claim…," and also added new information and damages to its claim. Exhibit 21, TSI's January 20, 2011 Request for Reconsideration ("January 2011 Claim").

80.     Specifically, TSI's January 2011 Claim reasserted and requested damages related to the Agency's bad faith 6005 T for C and requested certain claim costs (reasonable attorneys' fees). See Exh. 21.

81.     TSI's January 2011 Claim included newly discovered facts based on what TSI learned from the J&A it received on January 3, 2011, as an attachment to the Contracting Officer's December 22, 2010 Final Decision. See Exh. 21.

82.     Specifically, the January 2011 Claim emphasized the prevalent errors and factual inconsistencies present in the Agency's J&A memorandum. See Exh. 21.

83.     TSI pointed out that the Agency had no intention to allow TSI to perform the 6005 Contract and fully intended to keep Aegis as the incumbent. TSI also pointed out that the Agency breached the 6005 Contract and wrongfully terminated TSI for convenience, and the rationale noted in the J&A was not accurate and was just a post-hoc rationalization for the Agency's actions. See Exh. 21.

84.     On February 2, 2011, TSI received the Agency's response to its January 2011 Claim. The Agency acknowledged TSI's reassertions of its prior claim, and issued a new final decision, and advised TSI of its appeal rights. See Exhibit 22, February 2, 2011 Final Decision; Exhibit 23, February 2, 2011 Email demonstrating TSI's receipt of the Contracting Officer's Final Decision.

85.     The Contracting Officer's February 2, 2011 final decision stated the following: (i) it did not agree to pay attorneys' fees for TSI's 6005 claim; and (ii) it did not agree to pay TSI's claim for the Agency's bad faith 6005 T for C. Exh. 22.

### 3.     June 2011 Claim

86.     On June 2, 2011, TSI filed another claim for breach of contract further detailing the Agency's bad faith, contractual breaches, and improper actions in handling the 6005 Contract, its subsequent T for C, and steering the contractual work to the incumbent, Aegis, through the use of an improper sole-source award.

87.     In its June 2011 Claim, TSI argued for the first time that the Agency's solicitation process was rife with solicitation improprieties including the improper use of commercial item test program under FAR 13.500 *et seq.*, and a conflict of interest between Agency and Aegis

20

personnel that tainted the J&A's validity and the Agency's subsequent award of the sole-source contract to Aegis. See Exhibit 24, TSI's June 2, 2011 claim.

88.    Specifically, this improper conflict of interest derives from the relationship between Ms. Regina A. Dubey, DoD, SES, the Agency's Program Director ("Dubey"), and Mr. Anthony Shopland ("Shopland"), an Aegis team leader assigned to the TFBSO security team.

89.    In her position as Program Director, Dubey exerted extreme influence over the 6001 Contract, the 6005 Contract, the 6005 T for C, the creation of the J&A, and the subsequent sole-source award to Aegis. Dubey signed the J&A for the Aegis one-month bridge contract running from June 25, 2010 to July 24, 2010. See Exh. 8.

90.    In addition, Dubey was one of the four Agency officials to sign the J&A allowing for the Aegis sole-source contract award. See Exh. 13. The June 2, 2011 claim requested damages due to the Agency's improper actions, comprised of: (i) anticipatory profits for the 6005 Contract ; and (ii) bid and proposal costs associated with TSI's proposal for the 6005 Contract. See Exh. 24.

91.    The claim was certified by the president of TSI in accordance with FAR 33.207(c). On July 12, 2011,[13] the Agency responded to the June 2, 2011 claim stating that it would not consider or provide a decision on the claim, because when TSI filed its January 20, 2011 claim, it knew or should have known of all the facts asserted in its June 2, 2011 claim. See Exhibit 25, Agency's response to TSI's June 2, 2011 claim.

---

[13] The document is incorrectly dated "12 July 2010."

21

## COUNT I – CDA CLAIM
### (The Agency's Termination of TSI's TFBSO Contracts for Convenience and Subsequent Sole-Source Award to Aegis Constitutes a Breach of its Duty of Good Faith and Fair Dealing.)

92.    Paragraphs 1 – 91 are re-alleged and hereby incorporated into this Count I by reference.

93.    The Agency and TSI entered into contractual relationships for the 6001 and 6005 Contracts. These contracts contained the implied duty of good faith and fair dealing by which the Agency promised to cooperate with the TSI in the performance of the contracts and to refrain from any act that would prevent or impede TSI from performing the contracts. They also contained an express covenant of good faith and fair dealing because FAR 1.602-2 requires a contracting officer to ensure that a contractor receives impartial, fair and equitable treatment.

94.    The Agency breached its duty of good faith and fair dealing owed to TSI when the Agency, through a continuum of offending and unreasonable conduct endeavored to give Aegis, rather than TSI, the benefits of the work to be performed under the 6001 and 6005 Contracts that had been awarded to TSI.

95.    After TSI was awarded the 6001 Contract on March 1, 2010, Aegis protested that award at the GAO and Patriot Group protested the award at the Court of Federal Claims; however, rather than defend the award of the 6001 Contract to TSI, the Agency breached the duty of good faith and fair dealing owed to TSI by terminating TSI's 6001 Contract for convenience on April 23, 2010, in what is now an apparent effort to give Aegis a second chance at winning the award in an open competition.

96.    After TSI was again awarded the work during the second round of open competition, Aegis protested the award of the 6005 Contract to TSI.  Following the GAO's denial of this Aegis protest on October 1, 2010, the Agency again breached its duty of good faith

22

and fair dealing owed to TSI when it terminated TSI's 6005 Contract for convenience rather than lifting the 6005 Stop Work Order, and began a sole-source solicitation process to Aegis that violated Federal statutes and regulations.

97.     The Agency's sole-source award to Aegis violated 10 U.S.C. § 2304(g)(1)(B) when it failed to conduct market research, which is a prerequisite to use the simplified acquisition test program, and failed to provide a 15-day advance notice of the solicitation. The Agency also failed to comply with several FAR provisions including: (1) FAR 13.501 and 12.207 when it included cost-reimbursement items in the contract; (2) FAR 3.101-1 by failing to mitigate or even address  an improper conflict of interest that existed between the Agency and Aegis in violation of FAR 3.101-1; (3) FAR 1.602-2(b) by failing to provide TSI  impartial, fair, and equitable treatment in improperly terminating the 6001 and 6005 Contracts for convenience and improperly awarding a sole-source contract to Aegis. In addition, the J&A violated FAR 13.501's requirements and contained misleading and false statements.

98.     The Agency's unjustified termination of TSI's TFBSO Contracts for convenience and subsequent improper sole-source award of that same work to Aegis constitutes a breach of the Agency's implied and express duty of good faith and fair dealing arising from the 6001 and 6005 Contracts, and resulted in significant damages to TSI.

99.     As a proximate result of the Agency's actions, TSI has suffered and continues continue to suffer substantial financial harm that TSI would not otherwise have suffered absent the Agency's breach of its implied duty of good faith and fair dealing.  This substantial financial harm has been set forth in TSI's certified claims of November 3, 2010, January 20, 2011, and June 2, 2011.

23

100.   As result of the Agency's breach of its duty of good faith and fair dealing, TSI is entitled to recover all damages sustained as result, including: (i) anticipatory profits on the 6005 Contract in the amount of $238,352.72; and (ii) reasonable line of credit interest charges that were directly incurred due to the Agency's breach on the 6005 Contract in the amount of $35,539.06.

## COUNT II – BID PROTEST
**(The Cancellations of the TFBSO Solicitations and the Sole-Source Contract Award to Aegis Were Arbitrary, Capricious, an Abuse of Discretion, and Violated Federal Statutes and Regulations)**

101.   Paragraphs 1 – 100 are re-alleged and hereby incorporated into this Count II by reference.

102.   Upon information and belief, the personal relationship that existed between Ms. Dubey, the Agency's Program Director, and Mr. Shopland, an Aegis team leader assigned to the TFBSO security team, was a clear improper personal conflict of interest under FAR 3.101-1.

103.   Upon information and belief, the improper conflict of interest was not mitigated or disclosed by the Agency, in violation of FAR 9.504(a).

104.   Due to the improper conflict of interest arising from the relationship between Dubey and Shopland, TSI did not receive impartial, fair or equitable treatment from the Agency. Rather, by manipulating the 6001 and 6005 Contracts and the Sole-Source Contract award to Aegis, Dubey effectively predetermined Aegis as the awardee, violating the FAR 1.602-2(b) requirement that all "contractors receive impartial, fair and equitable treatment."

105.   The J&A was in violation of Federal statutes and regulations. FAR 13.501(a)(1)(ii) authorizes an agency to use a test program for certain commercial items as further described in FAR Part 12. FAR 12.207(e) prohibits the use cost reimbursement and cost-plus contracts. Although the Agency called the Aegis Sole Source Contract a firm-fixed-price

24

contract, Aegis's contract actually included line items that were cost-re-imbursement items and one line item that was a cost plus percentage of cost. See Exh. 14, p. 5. Thus, the sole-source contract award to Aegis violated FAR 12.207.

106.    10 U.S.C. § 2304(g)(1)(B) requires the performance of market research as a prerequisite to the use of the test program. According to paragraph 8 of the J&A, the Agency concluded that market research was "N/A." Thus, the sole-source contract award to Aegis violated 10 U.S.C. § 2304(g)(1)(B).

107.    10 U.S.C. § 2304 also requires the Agency to comply with the simplified acquisition requirements in 41 U.S.C. § 427 which in turn requires Agency compliance with 41 U.S.C. § 416. The latter statute imposes a requirement that the Agency provide a 15-day advance notice of solicitation to be published on Fedbizopps.gov, unless an exception applies. Although the Agency apparently invoked the exception under 41 U.S.C. § 416(c)(1)(F), that exception does not validly apply here, and the Agency's failure to provide a 15-day advance notice of the solicitation to be published in Fedbizopps.gov was in violation of Federal law.

108.    Additionally, the Agency's position in the J&A that Aegis was the only contractor that could meet the Agency's requirements was based on false and misleading statements, thereby rendering the Agency's sole-source contract award to Aegis arbitrary, capricious, and an abuse of discretion.  Specifically, the Agency's concerns that the "[t]he mission would be impacted by a new service provider not being able to attract and retain a quality workforce for just two months, increasing the transition costs, and not having a contractor with the familiarity and experience required to operate within the ITO," and that two months would not be sufficient time for a new contractor to create positive relationships and connections with the local leaders were unfounded as to TSI, given TSI's extensive experience in executing security, training and

25

logistical contracts in Iraq since early 2008 and TSI's familiarity with the security requirements regarding the Iraqi Theater of Operations.

109.    Additionally, the Agency's statement that the timeframe and costs associated with mobilizing a workforce by November 24, 2010 made it necessary to make a sole-source award to Aegis is misleading. If the Agency had lifted the 6005 Stop Work Order on October 1, 2010, the date that Aegis's second GAO protest was denied, TSI would have been fully able to execute the 6005 Contract requirements by November 3, 2010. By not lifting the 6005 Stop Work Order on October 1, 2010, the date the Aegis protest was denied, the Agency was solely responsible for manufacturing the situation that resulted in TSI being unable to fully execute the requirements by November 25, 2010.

110.    Because the purported justifications for the sole-source award to Aegis were false and misleading, the Agency's award of the Aegis Sole Source Contract lacks a rational basis and is arbitrary, capricious and an abuse of discretion.

111.    The Agency's improper sole-source award to Aegis prejudiced TSI.  But for the Agency's violations of Federal statutes and regulations and its arbitrary, capricious, and unreasonable justification for the sole-source award in the J&A, TSI would have been a qualified bidder and would have competed for the contract if the bid process had been made competitive. TSI had twice been awarded the TFBSO work that was the subject of the sole-source award.

112.    As a result of the Agency's improper sole-source award to Aegis, TSI seeks recovery of its bid and proposal costs for the 6001 and 6005 Contracts, in the amount of $92,697.10 and $28,038.09, respectively.

## PRAYER FOR RELIEF

WHEREFORE, TSI respectfully requests that this Court grant the following relief:

a.       Award TSI damages on its CDA claim in the amount of $238,352.72 for lost anticipatory profits on the 6005 Contract and $35,539.06 for reasonable line of credit interest charges on the 6005 Contract, sustained as a result of the Agency's breach of its duty of good faith and fair dealing, including the Agency's unjustified termination for convenience of TSI's contracts;

b.       Award TSI its bid and proposal costs in the amount of $92,697.10 and $28,038.09 for the 6001 and 6005 Contracts, respectively, which were improperly terminated so that the Agency could award an improper sole source contract to Aegis that was arbitrary, capricious, an abuse of discretion and in violation of Federal statutes and regulations;  and

c.       Grant such other and further relief, including the award of reasonable attorneys' fees, court costs, and other costs as the Court may deem just and proper.

Dated: January 30, 2012                     Respectfully submitted,

BERENZWEIG LEONARD, LLP
8300 Greensboro Drive, Suite 1250
McLean, Virginia 22102
(703) 760-0402 (telephone)
(703) 462-8674 (facsimile)
Terrence M. O'Connor, Esq.
Stephanie D. Wilson, Esq.
Kathryn M. Lipp, Esq.
toconnor@berenzweiglaw.com
*Counsel for Plaintiff TigerSwan, Inc.*